UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERNEST P. HOWLAND<br><br>     Plaintiff,<br><br>v.<br><br>HOME DEPOT U.S.A., INC.<br><br>     Defendant. | C.A. No. 04 CV 11466 (RWZ)<br><br>**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |

Pursuant to Local Rule 56.1, Defendants submit the following undisputed material facts of record.[1]

1.   Plaintiff Ernest P. Howland ("Plaintiff" or "Howland") began working for Defendant Home Depot U.S.A, Inc. ("Defendant" or "Home Depot") at its Avon, Massachusetts location in October 2001 as a sales associate in the plumbing department. (Deposition of Ernest P. Howland ("Howland Deposition"), p. 41, annexed hereto as Tab A to Declaration of Leah M. Moore).  Howland understood that he was an at will employee and that "[he could] quit or be terminated at the will of [his] employer [Home Depot]." (Howland Deposition, p. 42).

2.   Plaintiff became a department head in June 2002, beginning in the millwork department and later transferring to the wall and floor covering department in December 2002. (Howland Deposition, pp.45-47, 53; Deposition of Kenneth M. Bleakney ("Bleakney Deposition" p. 61, annexed hereto as Tab B to Declaration of Leah M. Moore).

---

[1] Defendant asserts these facts from the record as undisputed for purposes of this motion only. All exhibits referred to herein are annexed to the Declaration of Leah M. Moore in Support of Defendant's Motion for Summary Judgment.

3. As a department head, Howland was ultimately responsible for everything that transpired in his department. (Howland Deposition, pp. 100, 105, 118, 140-41; Bleakney Deposition, pp. 78-82).

4. At the time of his termination in April 2004, Howland was the department head of the wall and floor covering. (Howland Deposition, p. 21).

**Plaintiff's Performance Issues**

5. During the first two years of his tenure with the Avon Home Depot, Howland enjoyed favorable reviews, promotions, and substantial raises, and he received multiple customer service and department head of the month awards. (Howland Deposition, pp. 45, 47; Bleakney Deposition, pp. 33, 37-38, 41-43, 46, 52-56, 59, 63-64, 66-72).

6. Beginning in late August 2003, Howland's performance began to deteriorate. On August 27, 2003, Howland received a discipline notice for violating safety policies and procedures. (August 27, 2003 Discipline Process Tracking Notice, annexed hereto as Tab C to Declaration of Leah M. Moore).

7. On September 8, 2003 and September 17, 2003, Howland was confronted by Ed Boylan ("Boylan"), an assistant store manager, about his (Howland's) department's disheveled state. (Howland Deposition, pp. 89-90; September 8, 2003 and September 17, 2003 Performance Discussion Tracking Form, annexed hereto as Tab D to Declaration of Leah M. Moore).

8. Howland received his first unfavorable review on September 14, 2003. (Howland Deposition, pp. 75-77; Bleakney Deposition, p. 87; September 14, 2003 Performance and Development Summary annexed hereto as Tab E to Declaration of Leah M. Moore). On September 17, 2003, Boylan communicated to Howland that the safety standards in his

2

department were lacking. (Howland Deposition, pp. 91-92; September 14, 2003 Performance and Development Summary).

9.  On September 24, 2003, the Avon store's District Manager reported to the store for an announced inspection. (Bleakney Deposition, p. 74). Howland's department was in such bad condition that management took pictures. (Bleakney Deposition, pp. 73-78; Photographs, annexed hereto as Tab F to Declaration of Leah M. Moore).

10. The pictures in Howland's department showed: 1) several empty bays, indicating that the items were out of stock and had not been reordered in a timely fashion; 2) poor maintenance of merchandise; and 3) general disorder and disarray. (Bleakney Deposition, pp. 74-81; Photographs). From management's perspective, these three specific problem areas were demonstrative of the fact that Howland was not adequately managing the daily operations of his department. (Bleakney Deposition, pp. 74-81).

11. Howland received a second performance review from Boylan on September 24, 2003, a direct result of his department's deplorable state on the day of an internally publicized inspection. (Howland Deposition, pp. 93-94; September 24, 2003 Performance and Development Summary, annexed hereto as Tab G to Declaration of Leah M. Moore). Boylan rated Plaintiff's overall performance an 'I' (the lowest possible score) and his leadership abilities a '4' (the lowest possible score). (Howland Deposition, pp. 95, 97-103; September 24, 2003 Performance and Development Summary). Despite the fact that the condition of his department was documented on film, Plaintiff insists that the September 24, 2003 review was "bogus." (Howland Deposition, p. 95).

12. As a result of his poor performance and in accord with Home Depot policy, Boylan placed Plaintiff on a performance improvement plan and explained to Howland that his

"failure to improve w[ould] result in future documentation up to and including termination." (Howland Deposition, pp. 108-09; Bleakney Deposition, pp. 111-13; September 24, 2003 Performance and Development Summary). Plaintiff had a clear understanding that his performance must improve or he would lose his position with Home Depot. (Howland Deposition, pp. 108-09; 132-33).

13. Over the course of the first performance improvement plan, Boylan and Howland "walked" Howland's department on a regular basis to point out areas where Howland's department needed improvement and to highlight areas where the department was in conformance with Home Depot's "grand opening ready" standard (meaning that the store appeared on a daily basis in a fully stocked, perfect condition as it did on the first day of the store's grand opening). (Howland Deposition, p. 108; September 24, 2003 Performance and Development Summary).

14. In October 2003, Howland communicated, extensively, with William Shea ("Shea"), the Avon store manager, about receipt of unfavorable reviews Howland believed were unjust and unsubstantiated. (Howland Depositions, p. 56). Howland believed the reviews were unjust because his prior reviews had been favorable. (Howland Deposition, p. 56).

15. On November 10, 2003, Boylan again provided Plaintiff with a review of his performance. (Howland Deposition, p. 111-12; November 10, 2003 Performance and Development Summary, annexed hereto as Tab H to Declaration of Leah M. Moore). Boylan's review mirrored the September 24, 2003 review, rating Howland's overall performance an overall 'I',' the lowest scores possible. (September 24, 2003 Performance and Development Summary; November 10, 2003 Performance and Development Summary). Because Plaintiff failed to significantly improve, management placed him on a second sixty day performance

4

improvement plan. (Howland Deposition, p. 114; November 10, 2003 Performance and Development Summary).

16.    In Home Depot's consistent effort to help Plaintiff improve, Boylan continued to "walk" Plaintiff's department and removed several of Plaintiff's supervisory duties, known as key carrying responsibilities, so that he could focus on improving the overall appearance of the wall and floor covering department. (Howland Deposition, pp. 126, 128-29, 131; November 19, 2003[2] Performance Discussion Tracking Form, annexed hereto as Tab I to Declaration of Leah M. Moore).

17.    Because Plaintiff continued to receive negative performance reviews, he continued to communicate with Shea about his performance. (Howland Deposition, pp. 56, 58-60).  Howland and Shea communicated more than twenty times about Howland's performance, and Shea explained to Howland the areas he needed to improve and how to accomplish it. (Howland Deposition, pp. 56, 58-60).

18.    In late November 2003, Howland suffered a workers' compensation injury. (Howland Deposition, pp. 61, 134; Bleakney Deposition, pp. 90-91).  As a result, he was out of work from November 20, 2003 until January 8, 2004 when he returned in a part time capacity. (Howland Deposition, p. 134; Bleakney Deposition, pp. 90-91).  Howland did not resume his full time duties until late January 2004, but understood that upon his return from leave due to the workers' compensation injury, Boylan's expectation of improved performance remained. (Howland Deposition, pp. 134-35; Bleakney Deposition, pp. 90-91).

---

[2] The November 11, 2003 Performance Discussion Tracking From is erroneously dated November 11, 2004.  Plaintiff does not contest that his key carrying responsibilities were removed in November 2003. (Howland Deposition, pp. 128-29).

19.     Because it was impossible to fairly track and rate Howland's improvement during the sixty days after his November 10, 2003 review due to the workers' compensation absence, when Howland received a third sub par review on February 10, 2004, he was placed on a third sixty day performance improvement plan. (Howland Deposition, pp. 135-36; 138-39; 142-45; 155-57; February 10, 2004 Performance and Development Summary, annexed hereto as Tab J to Declaration of Leah M. Moore). Like they did during his first two performance improvement periods, Boylan and Howland continued to walk Howland's department. (Howland Deposition, p. 145).

20.     Despite placing him on three performance improvement plans, reducing his duties, and conducting walks around his department, Howland's performance failed to significantly improve. Performance discussion tracking forms dated March 1, March 22, March 26, and April 1, 2004 indicate that although Howland's performance was better, it still remained below acceptable standards.[3] (Howland Deposition, pp. 148, 151-52, 157, 162-63, 174-75; March 1, 22, 26 and April 1, 2004 Performance Discussion Tracking Forms, annexed hereto as Tab K to Declaration of Leah M. Moore).

21.     After seven months on three, consecutive performance improvement plans with little to no improvement, Howland was permanently removed from his position with Home Depot by Boylan on April 15, 2004, five days after his third, consecutive sixty day performance

---

[3] Though he does recall some communication with Boylan during this time, Howland does not recall all of the counseling sessions documented on the Performance Discussion Tracking Forms. (Howland Deposition, pp. 151-53, 155, 157-58, 160-62). According to Howland, sometime after his termination, a Home Depot employee told him that Boylan was "filling out paperwork with [his] name on it." (Howland Deposition, pp. 164-65). Plaintiff contends this is evidence that the reviews by Boylan were unfair and inaccurate. (Howland Depositions, pp. 170-74; 231). As discussed in section II.C.(1) Defendant's Memorandum of Law, the testimony about this conversation is hearsay and cannot be introduced as evidence. *See Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 153 F.Supp.2d 62, 69 (D.Mass. 2001) (Ponsor) (citing *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 583 (1st Cir. 1999)).

improvement plan ended. (Howland Deposition, pp. 21, 177-78; April 15, 2004 Termination Notice, annexed hereto as Tab L to Declaration of Leah M. Moore).

22.    Howland received unemployment compensation after his departure from Home Depot. (Howland Deposition, p. 21).  He began working at Ocean State Job Lot as an assistant store manager in at Quincy, Massachusetts store in September 2004 where he earns $37,500 per year and receives full family medical insurance as part of the benefits associated with his employment. (Howland Deposition, pp. 24-27, 227-29).

**Plaintiff's Request for Leave**

23.    In late 2003 and early 2004, the Howlands began to plan for the birth of their second child.  Because Plaintiff's wife needed to deliver by cesarean section, in January 2004, the Howlands selected April 23, 2004 as the date for delivery. (Howland Deposition, pp. 179-80).

24.    Howland contends that in late January or early February 2004, he requested seven days of vacation beginning on April 23, 2004 so that he could be with his family after the birth of his son. (Howland Deposition, pp. 31, 179-81, 189-92).  Howland was not unfamiliar with this process; he had previously elected to take vacation leave in May 2002 immediately after the birth of his first child. (Howland Deposition, p. 199).

25.    Home Depot employees often decide to take vacation or personal leave over other forms of unpaid leave so that the employee enjoys a *de facto* paid leave of absence. (Bleakney Deposition, pp. 124, 132).  As a result, even though Home Depot only requires that its employees have one year of service prior to requesting FMLA leave (instead of the stricter 1250 hours of service over the prior twelve months as required by the law), many forego FMLA leave

entirely or use only a portion of the guaranteed twelve week leave, opting instead to make use of all forms of paid vacation/leave benefits. (Bleakney Deposition, pp. 124, 131-32).

26. According to Howland, while his request for vacation was initially approved, it was later denied. (Howland Deposition, pp. 31-34, 180-81, 200-01). Because he was concerned about the denial of his vacation request, Howland approached Sylvia Ramsdale ("Ramsdale"), then the Avon store's scheduler, and asked her to speak with Shea about his vacation request. (Howland Deposition, pp. 34, 203, 206).

27. Howland contends that Ramsdale told him that upon approaching Shea about Howland's vacation request, Shea told Ramsdale that "[Howland] wasn't going to [get the requested leave] because when [Shea's] wife had a baby, [Shea] only took one day off [from work]."[4] (Howland Deposition, pp. 35, 39, 204, 206). Ramsdale then told Howland that he should request leave under the FMLA. (Howland Deposition, pp. 36, 39, 204, 206, 210-11).

28. Without being instructed by Howland, Ramsdale reported to Kenneth Bleakney ("Bleakney"), the Avon store's human resources manager, that Howland may be interested in taking a leave of absence under the FMLA to care for his wife and children after the impending birth by cesarean section of his son. (Howland Deposition, pp. 36, 203, 208-09, 211; Bleakney Deposition, pp. 113-15). According to Howland, these conversations took place on April 13, 2004 – just ten days prior to the birth of his son. (Howland Deposition, pp. 210-11).

29. Though both Howland and Bleakney acknowledged that Ramsdale was the person who made Home Depot aware of Plaintiff's contemplation of FMLA leave, their testimony differs. (Howland Deposition, p. 39; Bleakney Deposition, pp. 115-16). According to Bleakney, immediately after Ramsdale spoke with him, he vividly remembers leaving his office, which was

---

[4] As discussed in section II.C.(1) of Defendant's Memorandum of Law, these comments are double hearsay and cannot be introduced as evidence. *See Weston-Smith*, 153 F.Supp.2d at 69.

just around the corner from Howland's department, to find Howland so that the two could discuss a potential FMLA leave because Bleakney "viewed family medical leave as a critical … a very serious matter[,] and it's something … [he] address[es] immediately with all associates."[5] (Bleakney Deposition, pp. 114-15).  Bleakney testified that he found Howland in the wall and floor department and asked him if he had "questions about vacation and family medical leave." (Bleakney Deposition, p. 114).

30. Howland responded to Bleakney's statement saying that he "had all the information [he] need[ed]" and was "not sure what [he was] going to do regarding when [he was] going to need vacation or family medical leave." (Bleakney Deposition, pp. 114-15; Howland Deposition, p. 214).  Bleakney then told Howland that as soon as Howland knew "what [he] want[ed] to do and when [he] want[ed] to do it, [to] please, come see me, and [Howland] said he would." (Bleakney Deposition, pp. 114-15).  Bleakney testified that these conversations took place in late March or early April 2004 and that subsequently, he and Howland never discussed the subject of vacation or FMLA leave again. (Bleakney Deposition, pp. 113, 115).

31. Howland contends that when Ramsdale informed Bleakney of her conversation with Howland regarding a potential request for FMLA leave, Ramsdale returned to tell Plaintiff that Bleakney stated Howland was entitled to FMLA leave. (Howland Deposition, pp. 36, 208-09).  Howland approached Bleakney the same day, April 13, 2004, to discuss the potential leave of absence. (Howland Deposition, pp. 211-12).  During this conversation, Plaintiff testified that he informed Bleakney of his desire to take FMLA leave, and Bleakney confirmed that Plaintiff

---

[5] As a government contractor, Home Depot is required to have an affirmative action policy and to train its managers on its procedure. (Bleakney Deposition, pp. 120-22).  Bleakney received training on FMLA procedures in 2003. (Bleakney Deposition, pp. 120-22; Home Depot AAP/EEO Training and Activity Log, annexed hereto as Tab M to Declaration of Leah M. Moore.)

was entitled to it. (Howland Deposition, pp. 36, 212-13). Howland has no other recollection of this conversation or how it ended. (Howland Deposition, p. 213).

32. According to Howland, he later approached Bleakney on either April 14 or 15, 2004 to request FMLA paperwork, but stated that he [Howland] still was unsure of the date he wanted the leave to begin and for how long he wanted the leave to last. (Howland Deposition, pp. 179, 214). Howland's termination for poor performance occurred on the evening of April 15, 2004. (Howland Deposition, pp. 212-14).

33. Howland contends that during conversations with Bleakney between April 13 and April 15, 2004, he formally requested FMLA leave. (Howland Deposition, pp. 36, 210-15).

34. Howland believes that his termination was retaliation by Shea for requesting leave under the FMLA[6] and that Shea "forced" Boylan to terminate him (Howland). (Howland Deposition, pp. 215-17, 231-32; Complaint, ¶¶ 5, 9). Howland bases this belief on his assertion that Shea should have been the person to terminate him. (Howland Deposition, pp. 215-17, 231-32; Complaint, ¶¶ 5, 9).

35. Bleakney explained that Home Depot policy requires the store manager and the human resources manager must discuss and approve terminations. (Bleakney Deposition, p. 108). Once this discussion has occurred, either the store manager or the human resources manager will instruct the employee's assistant manager to terminate the employee. (Bleakney Deposition, p. 108). Home Depot requires that its assistant managers terminate employees so

---

[6] During his deposition, Howland originally testified that he "absolutely" believed Boylan "was responsible for" and "had a lot to do with" his termination. (Howland Deposition, pp. 171, 173). After Plaintiff so stated, Plaintiff's counsel requested a break. (Howland Deposition, p. 173). Following the break, counsel stated that his client wanted to clarify his prior testimony, and Howland stated that while he (Howland) believed Boylan fabricated the reviews, he believed the termination was Shea's attempt to retaliate against him for requesting FMLA leave. (Howland Deposition, pp. 173-74, 231-32).

that both the store manager and the human resources manager are available to the employee should the employee have questions concerning the termination. (Bleakney Deposition, p. 108).

                               Respectfully submitted,

                               HOME DEPOT, U.S.A., INC.

                               By its attorneys

                               ___/s/ Leah M. Moore_____
                               Robert P. Joy (BBO No. 254820)
                               Leah M. Moore (BBO No. 658217)
                               MORGAN, BROWN & JOY, LLP
                               200 State Street
                               Boston, Massachusetts  02109
                               617-523-6666 (phone)
                               617-367-3125 (fax)

Date:  July 15, 2005

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing document was served upon counsel for Plaintiff, Charles E. Berg, OFFICE OF ALBERT E. GRADY, 226 Montello Street, Brockton, MA 02401, by first-class mail this 15th day of July 2005.

                               _/s/ Leah M. Moore_____
                               Leah M. Moore