1  Q. After every review?
2  A. I approached him so many times, and it
3  was basically always the same thing. I even
4  approached to him, you know, here I was starting
5  to get these bad reviews, I even approached him
6  that I was getting reviewed as a department
7  head, that I haven't even been through the
8  department head training. I brought that up as
9  an issue. Okay, you're saying certain things,
10 so I brought that up.
11 Q. Did you receive the training?
12 A. Roughly about less than two weeks
13 before I was terminated.
14 Q. When did you bring up the issue of
15 department-head training?
16 A. Constantly. The whole time I was a
17 department head. He'd schedule me for it, and
18 then he'd cancel them on me because something
19 else was coming up in the store, you know, it
20 could have been a walk, it could have been
21 anything.
22 Q. If you had to quantify it, how many
23 times do you think you went to Mr. Shea?
24 A. Offhand, I couldn't answer that.

1    Q.    More than 20?
2    A.    Oh, easily.
3            MR. JOHNSTON:  Can I take a break?
4            MS. MOORE:  Sure.
5            (Recess taken from 11:00 a.m.
6            to 11:11 a.m.)
7            MS. MOORE:  Could you read back the
8    last exchange?
9            (Record read)
10   BY MS. MOORE:
11   Q.    After you went to Mr. Sherman in
12   October of 2003, did you ever go to him again
13   with a complaint?
14   A.    No.
15   Q.    Did you continue to go to Bill Shea
16   with complaints?
17   A.    No. It wasn't complaints. He's my
18   manager. Home Depot has an open-door policy.
19   That's basically what it was.
20   Q.    So you were just simply going to your
21   store manager with concerns?
22   A.    Yes.
23   Q.    Mr. Howland, your workers' comp. entry
24   has sort of come up in conversation. I just

61

1  want to make sure we narrow the time, talk a
2  little about it, and then we'll move on.
3         My understanding is that you had a
4  shoulder injury; is that correct?
5     A.   Yep.
6     Q.   In November of 2003?
7     A.   November 19th, I believe.
8     Q.   Did you take workers' comp. leave?
9     A.   I went out on workers' comp.
10    Q.   Were you paid?
11    A.   Yeah.
12    Q.   Did you get all of the leave that you
13  requested?
14    A.   I don't understand.
15    Q.   Was there ever any dispute about time
16  off that you needed?
17    A.   Absolutely.
18    Q.   There was?
19    A.   Yes.
20    Q.   And what was that?
21    A.   Well, I'd give a doctor's note to Ken
22  Bleakney, and I'd get a phone call telling me
23  he's going to send a taxi to my house to pick me
24  up when I was on a doctor's note saying I could

75

1  upper-right-hand corner, Ernie Howland?
2       A.   No, it's not.
3             MR. JOHNSTON:  It says Ernie
4  Holland.
5  BY MS. MOORE:
6       Q.   Were you at Store Number 2671?
7       A.   Yes, ma'am.
8       Q.   Okay.  And you were there in August of
9  2003?
10      A.   Yep.
11      Q.   And it's your testimony today you've
12 never seen this before?
13      A.   I've never seen this.
14      Q.   Okay.
15            MS. MOORE:  Would you mark this,
16 please.
17            (Exhibit 2 marked
18             for identification)
19      Q.   For the record, Mr. Howland, I've just
20 given you what's been marked as Exhibit 2.  It's
21 entitled Performance and Development Summary
22 (side 2 - hourly associates).  It's dated
23 September 14, 2003, and it has your name in the
24 upper-left-hand corner.

Ernest Howland

76

1  Are you familiar with this document?
2  A.  Yeah.
3  Q.  Have you seen it before?
4  A.  Yes.
5  Q.  When did you see it?
6  A.  That date. That's my handwriting, so
7  I'd say that's the date I saw it.
8  Q.  You're testifying that your signature
9  is there on the left-hand corner above the word
10 associate?
11 A.  Yep.
12 Q.  Do you remember who provided you with
13 this review?
14 A.  It has Bill Shea's name on it. And if
15 I'm right, I believe Ken Bleakney was involved
16 on this one too.
17 Q.  What do you mean "involved"?
18 A.  I think he was sitting there during
19 it.
20 Q.  Okay. So it's your testimony that
21 when you were given this review, it was given by
22 Mr. Shea, but Mr. Bleakney was in the room?
23 A.  Yeah. We were in the expediter's
24 office. If I'm right, this is the one he was in

Ernest Howland

77

1  there.
2  Q. You'll note that at number three it
3  says that you were "missing sales YTD."
4  Is YTD year to date?
5  A. Yeah.
6  Q. Did you agree with this review at the
7  time it was given to you in September of 2003?
8  A. There's a second page to it where it
9  has comments. If I didn't agree to it, I would
10 have written on that report.
11 Q. Do you recall whether you had agreed
12 with it?
13 A. With this one, I don't even think I
14 agreed with this one.
15 Q. Do you remember definitively one way
16 or the other?
17 A. No, I don't.
18     MR. JOHNSTON: Do you have the
19 second page?
20     MS. MOORE: Perhaps, but this is
21 what I've got for right now. I'm not being coy
22 with you.
23     MR. JOHNSTON: I know.
24 A. I'm just saying there was a second

89

1  recall. I'm talking about a talking, but I've
2  never seen this form or anything of it.
3      Q.  Okay. And, for the record, this is
4  simply a tracking form whereby it appears that a
5  manager or supervisor has a discussion with an
6  associate, documents the date and the reason for
7  the discussion with the associate.
8          Could you read the reason for the
9  discussion after -- I'm sorry. Could you read
10 the reason for the discussion for the date
11 9/8/2003?
12     A.  I can't even read it.
13         MR. JOHNSTON: I object to your
14 generalization of what this form is. We don't
15 know what this form is.
16 BY MS. MOORE:
17     Q.  You can't read it?
18     A.  No. My copy, I can't read it.
19     Q.  I will represent to you that the first
20 line says, two words that I can't read, "on the
21 back half of Department 23, it was a mess."
22         Was Department Number 23 your
23 department?
24     A.  Floor and wall, yes.

1  Q. It goes on on the second line,
2  "Explain to him that this was" what looks to be
3  "unexpectable," unacceptable perhaps, "that I
4  would support him in any way, but when it got
5  fixed, it was his responsibility to keep it
6  maintained."
7  Do you remember any kind of
8  conversation about that?
9  A. I really don't know.
10  Q. Moving onto the second date,
11  September 17, 2003.
12  MR. JOHNSTON: There's more written
13  there. Can you just not read the rest of it?
14  MS. MOORE: No, I can. I just
15  wasn't going to.
16  BY MS. MOORE:
17  Q. At your lawyer's request, we'll go on.
18  My understanding of what it says, continuing on
19  the third line, "Half hour later Ernie came up
20  to me and explained that Arnie," I assume the
21  district manager, "was due to walk him for a
22  promotion. I told Ernie that the way the
23  department looked, he didn't deserve it. He
24  said he was going to ask for a transfer if he

91

1   didn't get a promotion walk by Arnie."
2        A.    I don't recall this at all.
3        Q.    Now moving on to --
4            MR. JOHNSTON:  Thank you.
5            MS. MOORE:  No problem.
6   BY MS. MOORE:
7        Q.    Now moving on to September 17, 2003.
8   Again, it's indicated here that Mr. Boylan
9   initiated a discussion with you. I'll read this
10  one as well, "Spoke with Ernie about staffing in
11  the department. We are getting him more bodies,
12  using performance management, working the
13  schedule variance report weekly. Safety in the
14  department is not up to par. Touched on having
15  key standards in 23. Will revisit next week in
16  our first weekly specialty sales meeting."
17           Do you recall a conversation like
18  that?
19       A.    No. I remember something about the
20  staffing in my department. I can't recall if it
21  was back then.
22           But even Bill Shea talked about the
23  staffing in my department because it came down
24  company-wide that specialty departments were

                                                            92

1   supposed to be 100 percent staffed.
2         After questioning this, we spoke, me
3   and the store manager, even at a meeting in the
4   Taunton store that my people were being taken
5   out after I got them trained.  They took out,
6   off the top of my head, roughly three people
7   right off the bat about the staffing after they
8   were properly trained.
9         Q.   So does that mean that you do recall
10  this conversation?
11        A.   I don't remember.  I don't recall it
12  being about that time.
13        Q.   Do you recall having conversations
14  with Ed Boylan?
15        A.   No.  I remember having a conversation
16  with Bill Shea concerning the staffing.
17        Q.   Do you remember having a conversation
18  with Ed Boylan about working the schedule
19  variance report weekly?
20        A.   Yep.  And he chose to do the weekly
21  variances himself on a weekly basis.
22        Q.   Do you recall having a conversation
23  with Mr. Boylan about safety in your department?
24        A.   I don't recall that, no.

93

1   Q.  Do you recall attending the first
2  weekly specialty sales meeting?
3   A.  I don't recall that either. I'm sure
4  I did, but I don't recall it.
5   Q.  Do you recall attending them --
6   A.  I recall going to a weekly specialty
7  sales meeting every once in a blue moon.
8   Q.  Okay.
9       MS. MOORE:  Would you mark this as
10  Exhibit 4, please.
11       (Exhibit 4 marked
12        for identification)
13  BY MS. MOORE:
14   Q.  Mr. Howland, what you've been handed
15  has been marked Exhibit Number 4. It's two
16  pages. They are marked DEF0033 and DEF0029.
17  Both include the date September 24, 2003.
18       Do you recognize these documents?
19   A.  Yes, ma'am.
20   Q.  When do you recall last seeing them?
21   A.  When do I recall last seeing them?
22   Q.  Yes.
23   A.  I saw them then, and I got a copy at
24  my house.

1      Q.   When you say "then," do you mean on
2   September 24, 2003?
3      A.   Yep.
4      Q.   Do you recall who presented you with
5   these documents?
6      A.   Ed Boylan.
7      Q.   Do you recall the circumstances under
8   which he presented you with these documents?
9      A.   It was another -- yes.
10     Q.   Could you tell me about them?
11     A.   He gave me another review after I
12  received a review from the store manager and
13  human resources 10 days prior.
14     Q.   And by that, you're referencing
15  Exhibit 2?
16     A.   Yep.  Which I did not understand,
17  first of all, getting this, after the store
18  manager had just given me a review, someone that
19  had worked with me and knew me, and he's only
20  been in the store not even two weeks, and he's
21  giving me a totally different review, which you
22  can actually put two pages and see where it
23  differs.
24     Q.   Was Mr. Boylan your ASM at the time he

Ernest Howland

95

1  gave you this?
2      A.   He just came to the store, yes, he
3  just came from our Taunton store.
4      Q.   Am I correct in surmising that you
5  disagreed with this review?
6      A.   Absolutely.
7      Q.   Why did you disagree with it?
8      A.   It's bogus.
9      Q.   Why do you say that?
10     A.   Well, one, you can actually go from
11 line to line, if you want to take this
12 (Indicating) page to this (Indicating).  My
13 store manager gives me a P as a performer 10
14 days prior, and he gives me gets things done as
15 an I.  I get a V, which is achiever, and
16 customer driven I get an I, once again, 10 days
17 later.  If you match these up for 10 days
18 difference, you're telling me I went that bad
19 downhill?
20          And I also viewed my concerns
21 concerning why I was getting this when my store
22 manager had just given me my review.
23     Q.   Did you ask anybody about why you were
24 given a second review on September 24, 2003?

Ernest Howland

97

1  to me. I didn't understand.
2     Q.  Let's go back to September 24, 2003.
3  Do you remember what happened on that date?
4     A.  Nothing.
5     Q.  Was there a store walk by the district
6  manager on that date?
7     A.  I don't recall.
8     Q.  Was there typically a store walk by
9  the district manager in September of each year?
10    A.  Not to my knowledge.
11    Q.  Was there a particular date that a
12 district manager would walk the store?
13    A.  No.
14    Q.  When you were given this review, was
15 it simply you and Ed Boylan, or was somebody
16 else there?
17    A.  Me and Ed Boylan on this one here.
18    Q.  Let's go through it starting with page
19 number DEF0029. It's the second page. You're
20 listed as improvement required on getting things
21 done. And you disagreed with that?
22    A.  Yep.
23    Q.  You were listed as improvement needed
24 under the customer driven area. Did you

1  disagree with that?
2      A.   Absolutely.
3      Q.   You were listed as performer for
4  associate sales knowledge and skills.  Did you
5  disagree with that?
6      A.   Yes, I did.
7      Q.   Why did you disagree with that?
8      A.   Because I had the knowledge of the
9  department 100 percent.
10     Q.   So is it your feeling that you should
11 have been marked as outstanding?
12     A.   Achiever, outstanding.
13          But I do want to make it for the
14 record, you mentioned about outstanding.
15 According to that store and my store manager,
16 nobody is outstanding.  That doesn't exist.  You
17 may see it on paper.  It doesn't exist.
18     Q.   Did you believe you were outstanding?
19     A.   Yeah, on a lot of things, but he
20 made -- I just want to make sure that you
21 understand that part about outstanding.  The top
22 grade does not exist.
23     Q.   And that's according to Bill Shea?
24     A.   Yes.

Ernest Howland

99

1  Q. And when did he tell you that?
2  A. Quite a few times during reviews.
3  He'd bring it up to everybody.
4  Q. Over the course of your employment?
5  A. Over the course of my employment to
6  all department heads and ASMs during our staff
7  meeting this was even brought up.
8  Q. Was that offensive to you?
9  A. Not offensive. I just didn't
10 understand why you got something on paper as
11 outstanding when they wouldn't give it to you.
12 Why even put it?
13 Q. I believe we were on product and
14 department knowledge, is that correct, number
15 four?
16 A. Yes.
17 Q. You were marked as performer, and you
18 disagreed with that?
19 A. Right.
20 Q. You felt you should have been
21 outstanding or achiever?
22 A. I'd say achiever.
23 Q. Under the driving sales area, you're
24 listed as improvement needed -- I should say

1  improvement required.  Did you disagree with
2  that?
3      A.  That's where we were talking about
4  with the sales.  It was industry.  But no matter
5  how you look at it, all the specialties were
6  losing, but, you know, if you want to get down
7  to truth, then I'd say yeah.
8      Q.  You disagreed with it?
9      A.  Well, I disagreed with it, but I was
10 losing in sales.
11     Q.  And at the end of the day it was your
12 responsibility to drive those sales?
13     A.  Try to drive it as best the my
14 knowledge.
15     Q.  For number six, ground engaged, you
16 were also listed as improvement required.  Did
17 you disagree with that?
18     A.  Yes.
19     Q.  Why?
20     A.  One, I know the business and the
21 industry and the competition.  I personally used
22 to go into Lowe's myself and other companies
23 that did the flooring just to see what the
24 industry was, to see where we were in pricing,

101

1   what the customer was looking for. I did that
2   on a constant basis on my own. So I didn't feel
3   that.
4        Q.   Did you think you should have been
5   rated as outstanding?
6        A.   P, performer, or achiever.
7        Q.   For communicates effectively you were
8   listed as improvement required. Did you agree
9   with that?
10       A.   No, I didn't.
11       Q.   Why not?
12       A.   Because I tried communicating to
13  everybody, my ideas, everything. I went from
14  even with my associates to my ASMs, store
15  manager. I thought I communicated very
16  effectively.
17       Q.   Acts with integrity, you were rated as
18  a performer. Did you disagree with that?
19       A.   Yep.
20       Q.   You felt it should have been
21  outstanding?
22       A.   Achiever. My integrity demonstrates
23  responsibility and honest behavior in all roles.
24  I was very honest and responsible in all my

Ernest Howland

102

1  roles, task and responsibilities. To be graded
2  on that with my integrity, I totally disagreed
3  with that.
4      Q.   For promotes teamwork you were rated
5  as an I. Do you disagree with that?
6      A.   Yes.
7      Q.   Demonstrates inclusion, you were rated
8  as a P. Did you disagree with that?
9      A.   I really don't even know what
10 inclusion means, to tell you the truth.
11     Q.   For self-development you were listed
12 as an I. Did you disagree with that?
13     A.   Yep.
14     Q.   Safety orientation, you were listed as
15 an I. Did you agree with that?
16     A.   Back at number 11, I didn't agree with
17 that. I disagreed with it. And then safety
18 orientation, yes, I disagreed with it.
19     Q.   And enthusiasm?
20     A.   Once again.
21     Q.   Disagreed?
22     A.   Disagreed.
23     Q.   Let's move onto the front page.
24          Would you read for me what is in the

1  leader's summary assessment, if you can read it?
2      A.   Yeah.  "Since coming to Avon over two
3  weeks ago, I have told Ernie to focus on
4  signage, being in stock, and having the
5  department maintenanced to grand opening ready
6  status.  None of these have improved.  The
7  signage department is deplorable.  We are out of
8  stock on many job lot items and regular
9  merchandises are" -- I can't read that word.
10     Q.   Regular merchandise?
11     A.   Are going bay by bay maybe.
12          "The product does not match the label.
13 Overall leadership, delegation and follow-up,
14 these key components that are not happening.
15 Furthermore, we are losing customer basis which
16 is in turn, it's hard hurting our sales goals.
17 Ernie needs to work his scheduled shift, no
18 exceptions."
19     Q.   At that time were you attempting to
20 reschedule your shift?
21     A.   No.  I'd work extra, and a lot of
22 times it might have been my store manager.  I
23 also worked in -- or another assistant manager I
24 talked to because maybe someone wasn't coming in