1  do my ordering as I could.
2      Q.   Okay.
3      A.   But there's actually a person that
4  does that.
5      Q.   And your testimony was in September of
6  2003, you didn't have the person who was doing
7  the inventory?
8      A.   Exactly.
9      Q.   If you had had the person to do the
10 inventory, would they have reported to you?
11     A.   Absolutely.
12     Q.   So at the end of the day, it was your
13 responsibility to insure that they were doing
14 their job?
15     A.   Absolutely.
16     Q.   Were you delegating tasks at that
17 time?
18     A.   Yes.
19     Q.   Were you leaving lists for your
20 associates to do certain things in your absence?
21     A.   I left lists on a daily basis.  I also
22 called on my own time every morning and every --
23 say when the night crew came in to follow up on
24 my notes, and that was on a daily basis.

108

1    Q.   Or the assistant store manager. And
2 you're saying that that didn't occur?
3    A.   It did not occur. I might have walked
4 with my ASM like an aisle or two. We'd correct
5 the issues.
6         MS. MOORE: I'm sorry, could you
7 read back what he just said?
8         (Record read)
9 BY MS. MOORE:
10   Q.   When you might have walked with your
11 ASM and you might have corrected issues, how
12 often would that be?
13   A.   I don't recall.
14   Q.   Could it have been once a week?
15   A.   No.
16   Q.   Could it have been every other week?
17   A.   Possibility.
18   Q.   Continuing in that same box, that
19 looks to be "Failure to improve will result in
20 future documentation, up to and including
21 termination."
22        Was this explained to you?
23   A.   I don't recall on that part.
24   Q.   Did you read it?

1   A.   But we write that in all of our even
2   writeups we do that.  We write that exact
3   phrase.  Even myself as a department head when I
4   had to write someone up, we put that in.
5   Q.   So you understood what it meant?
6   A.   Yeah.
7   Q.   Did you question Mr. Boylan about the
8   weekly walks when you said they didn't happen?
9   A.   All the time.
10  Q.   So it's your testimony that you
11  requested that Mr. Boylan walk you?
12  A.   Yes.
13  Q.   How often would you request it?
14  A.   As often as I could.  There was times
15  when you have your department looking so great,
16  you wanted to get it walked.
17  Q.   So you would request it once a week?
18  A.   I don't recall.  I wouldn't say once a
19  week because my focus was also on the sales too
20  at the same time, if I didn't have the people.
21  Q.   When you received this review, did you
22  understand that you had to improve your
23  performance?
24  A.   Absolutely.

111

1    MR. JOHNSTON: The document speaks
2 for itself, but the Bates stamp 0028 does not
3 contain a name on the first page as the other
4 ones have.
5 BY MS. MOORE:
6    Q.   Mr. Howland, do you recognize these
7 documents?
8    A.   Yes.
9    Q.   Directing your attention to the first
10 page of Exhibit 5 that's marked DEF0028, do you
11 see the bottom-left-hand corner, where it says
12 associate?
13    A.   Yep.
14    Q.   Is that your signature?
15    A.   Yes.
16    Q.   Is it your understanding that this
17 review pertains to you?
18    A.   Yes.
19    Q.   Can you tell me who gave you this
20 review?
21    A.   Ed Boylan.
22    Q.   What date did you receive this review?
23    A.   11/10.
24    Q.   2003?

                                                                    112

1    A.   2003.

2    Q.   Do you recall anyone else being
3  present for the review?

4    A.   I don't recall.

5    Q.   Did you agree with this review?

6    A.   No.

7    Q.   You disagreed with it?

8    A.   Disagreed.

9    Q.   In its entirety?

10   A.   100 percent.  It's actually listed on
11 the next page that I actually wrote it in my
12 comments.

13   Q.   Let's go to that second page.  Under
14 associate comments you write, "I do not feel I
15 am an I or a 4 since last performance review."

16   A.   Yes.

17   Q.   Why did you feel that way?

18   A.   Because since our last review, I put
19 my head together on pushing on what needed to be
20 done.  When this review was being done, I really
21 felt very uplifted when we were going to get
22 ready to have it, and it didn't happen, because
23 I thought I had improved on almost everything.

24   Q.   Did you express that to Mr. Boylan?

114

1 all that is needed."
2     Q.   At the time you were given this review
3 in November of 2003, did you understand what
4 Mr. Boylan was trying to get you to do?
5     A.   Yes, and I did it.
6     Q.   What was it that Mr. Boylan was trying
7 to get you to do?
8     A.   Getting into the aisles to train my
9 people, which I did.
10     Q.   What did he want you to train them on?
11     A.   Grand opening ready process.
12     Q.   So going back to the original review,
13 I believe it was in early September we were
14 talking about the fact that your department was
15 not at grand opening ready status yet, and you
16 had been marked as needing improvement in that
17 area; is that correct?
18     A.   Right.
19     Q.   And here in November of 2003, two
20 months later, Mr. Boylan is still indicating
21 that you need to improve in grand opening ready
22 status; is that correct?
23     A.   He is kind of saying that, but the
24 problem is is also what was brought up

1  ready?
2      A.   When they were done.  They were
3  supposed to come to me, and then there was a
4  paper for each bay that we would do a checklist
5  on it.
6      Q.   So you were the person who would
7  determine whether or not it was grand opening
8  ready?
9      A.   No.
10     Q.   Who did that?
11     A.   It went -- like I told you, it went in
12 stages.  After they thought it was complete,
13 they came to me.  I walked the whole list with
14 them and seeing, you know, was every item
15 labeled, was everything faced off, was it
16 unopened packages.  So once I signed off on it,
17 now it went to the ASM.
18     Q.   Okay.  But before it went to the ASM,
19 it was your responsibility to insure that in
20 fact what they thought was grand opening ready
21 was grand opening ready?
22     A.   Right.  And if it wasn't grand opening
23 ready, it wouldn't go to the ASM unless it was
24 grand opening ready.

126

1    A.    I'm sure he walked with me once
2  because also if you look at the date of this, I
3  ended up getting hurt on the job during -- it
4  was the 19th.
5    Q.    That you were hurt?
6    A.    When I did my shoulder.
7    Q.    So do you recall if you did a walk
8  prior to being injured?
9    A.    Yes, I'd say we did, probably.
10   Q.    Okay. The last thing is DST college,
11 November 17th.
12   A.    Department special training. That's
13 what we were talking about, the department
14 training.
15   Q.    But you mentioned to me that you
16 didn't do it until April.
17   A.    It got cancelled.
18   Q.    Do you know why it was cancelled?
19   A.    Offhand I can't say. I remember one
20 of my DSTs being cancelled due to we were
21 getting ready to get walked on one occasion. It
22 was cancelled a couple of times, and it was
23 usually whether it was a walk or something that
24 Bill Shea, the store manager, told me I'm not

128

between Ed Boylan, Bill Shea, and Ken Bleakney on November 19th, dated 2004, which we presume is 2003.

Would you read for me, if you can, the reason for the discussion?

A. "Due to the poor condition of one's department, signs, stock, maintenance, GOR, safety, we discussed with Ernie that we were taking his key-carrying responsibilities away from him so he could focus all of his attention on running his department. We felt he needed to become more ground engaged in what was going on in Department 23/59, and the added stress of being pulled away was taking him away from doing his job. We told him all the ASMs were aware of this and for them not to pull him from his departments."

Q. Do you remember having a conversation with any one of these three men about your key-carrying responsibilities?

A. I don't remember the exact date, so I can't say that was the exact date, but I do remember the discussion concerning this, that they took my key away.

1  Q. Did you have a problem with that?
2  A. No.
3  Q. When you say they took your key away,
4  can you tell me what that meant?
5  A. The store keys.
6  Q. You were an individual who had the
7  added responsibility of carrying keys to open
8  the store?
9  A. Yes.
10 Q. Do you know when you were given that
11 responsibility?
12 A. Probably about a year. But once
13 again, it's a responsibility that you go to
14 class for this. I was handed the keys. I never
15 received the training to be a key carrier.
16 Q. Do you remember if it was when you
17 were in millwork or if it was when you were --
18 A. When I was in floor and wall.
19 Q. So you were a department supervisor at
20 the time --
21 A. Yes, when I received that.
22 Q. When you became a key carrier?
23 A. Yep. It is given to me by Kim
24 Arcikowski per Bill Shea's orders and Norman, my

Case 1:04-cv-11466-RWZ   Document 13-4   Filed 07/15/2005   Page 11 of 20

Ernest Howland

131

1  Q. Were you upset when they removed the
2  key-carrying responsibilities?
3  A. No.
4  Q. Did you have any concerns about it at
5  all?
6  A. I asked why. I just didn't
7  understand, you know, because we just -- no
8  reason. I didn't know.
9  Q. Did you have a conversation or express
10 any concern to Bill Shea?
11 A. Not that I recall.
12 Q. Did you feel that taking your keys
13 away would help you to focus on your particular
14 department?
15 A. Yeah.
16           MS. MOORE: Would you mark this,
17 please.
18           (Exhibit 7 marked
19           for identification)
20 BY MS. MOORE:
21 Q. Mr. Howland, you've just been handed
22 what has been marked as Exhibit 7. For the
23 record, it is a Bates stamped document numbered
24 DEF0026 and DEF0027.

JONES REPORTING COMPANY
617-451-8900

132

1   When you've had a chance to review it,
2   just let me know.
3             (Pause)
4       A.   Yep.
5       Q.   Mr. Howland, I'm going to take you
6   back to Exhibit 6 for just one second.  I
7   apologize for not -- I misspoke again,
8   Exhibit 5.  I apologize for not asking you this
9   question when we were there.
10      A.   Yep.
11      Q.   When you received this review, did you
12  understand that you were on a performance
13  improvement plan?
14      A.   No, not during this time.
15      Q.   When you received the prior
16  performance improvement plan in September and it
17  said that if you didn't improve, you were
18  subject to other discipline, up to and including
19  termination --
20      A.   Right.
21      Q.   -- did you understand that you needed
22  to improve or you could lose your position?
23      A.   Right.
24      Q.   When you received Exhibit Number 5,

133

1  did you understand that you still needed to
2  improve?
3      A.   Which I was.
4      Q.   Did you understand that if you didn't
5  improve, you were subject to termination?
6      A.   Yes.
7      Q.   Okay.
8      A.   On this one I wasn't. The one I wrote
9  it on I did. You're losing me here.
10     Q.   That's fine.
11          On Exhibit 5, the September 2003
12 review, you understood that if you didn't
13 improve, you were subject to termination?
14     A.   Right.
15     Q.   When you received the follow-up review
16 in November 2003, which is marked as Exhibit 5,
17 did you understand that if you didn't improve
18 your performance, you were subject to
19 termination?
20     A.   No.
21     Q.   We'd just been looking at Exhibit 7
22 prior to that digression. We are now on
23 Exhibit 7. It's dated February 10, 2004.
24          Is that your signature on the

134

1  bottom-left-hand corner above associate?
2       A.   Yep.
3       Q.   Between the time you received
4  Exhibit 5, which was the November review, and
5  the time you received this Exhibit 7, you were
6  away on workers' comp.; is that correct?
7       A.   Absolutely.
8       Q.   And your leave was approximately seven
9  or so weeks?
10      A.   Seven or eight weeks, yes.
11      Q.   When you came back to the store, did
12 you understand that your performance was still
13 being tracked?
14      A.   Absolutely.
15      Q.   So when you returned in January of
16 2004, you understood that Mr. Boylan was still
17 looking for your performance to improve?
18      A.   Absolutely.
19      Q.   Do you recall when you were given this
20 review?
21      A.   Absolutely.
22      Q.   When was this?
23      A.   Back in February, right after I
24 returned back from workers' comp.

Ernest Howland

135

1  Q. Did you return in January or in
2  February?
3  A. The end of January I believe it was.
4  Q. Do you remember who provided you with
5  this review?
6  A. Ed Boylan.
7  Q. Was anybody else there, if you recall?
8  A. I can't remember on this one. I don't
9  know if there was one after this. Ken Bleakney
10 was there on that, and I don't know if it was
11 this one or not.
12 Q. Okay. Fair enough.
13    Did you agree with this performance
14 review?
15 A. No.
16 Q. Why didn't you agree with this?
17 A. Because I was only back only a week,
18 and I was being given a performance review after
19 returning back to work from an injury one week.
20 I just didn't think it was right to be getting a
21 review.
22 Q. Did you express that concern to
23 anybody?
24 A. Yes, I did.

1  Q. To who?
2  A. To Ken Bleakney and Ed Boylan.
3  Q. When you expressed the concern to Ed
4  Boylan, was it at the time he provided you with
5  this review?
6  A. Yes.
7  Q. What was his response?
8  A. He still had to give it to me.
9  Q. Did he tell you why he had to give it
10 to you?
11 A. He mentioned that we were picking up
12 from where we ended off back in November, which
13 is understandable. But I'm trying to say they
14 gave me one, and then I worked a week, and I
15 left, I got hurt. I just didn't feel that was
16 being fair. You come back from an injury and
17 then being given one a week later.
18 Q. Did you feel this review was markedly
19 different than the review you received prior to
20 leaving?
21 A. Yes.
22 Q. So you felt they were substantially
23 different reviews?
24 A. When I came back, I was working my

138

1  A. Yes, I did.
2  Q. -- Ed Boylan?
3  A. Yes, I did.
4  Q. You also mentioned that you spoke with Ken Bleakney about your concerns?
6  A. Yes.
7  Q. Do you recall when you spoke to him?
8  A. Right when this was given to me.
9  Q. Do you recall what you said to him?
10 A. Not exactly, but basically it was because of the fact of getting a review a week after I returned.
13 Q. And what did he say to you?
14 A. I don't recall.
15 Q. Do you remember any -- the general gist of what he said?
17 A. No, not on this one, no.
18 Q. Do you remember him explaining to you at all that it was simply a follow-up to where you left off in November?
21 A. No.
22 Q. Did you understand this to be a follow-up to where you left off in November?
24 A. It was never told to me, but in the

139

1  back of my head probably, I probably realized
2  it.
3      Q.   Even though it says, "This is a
4  follow-up to Ernie's last review," you didn't
5  think of it as a follow-up, you just thought of
6  it as starting over?
7      A.   You're seeing this, but when it was
8  given to me, no, I did not look at it that way.
9      Q.   That's fair.  I just want to make sure
10 we're on the same page.
11          Mr. Boylan states under his
12 development plans that "You need to do aisle
13 walks daily for associates with follow-ups."
14          Did you do that beginning in February?
15     A.   As soon as I came back, yes.
16     Q.   "You need to push for 100 percent in
17 stock level, work with IMA on a daily basis."
18          Had you been given a person to do IMA
19 work at that point?
20     A.   That I can't remember, if I got one
21 then.  We got one kid that was doing a few
22 departments.  He didn't know nothing about my
23 department, so at the time I could say he wasn't
24 my IMA right then and there.

Ernest Howland

140

1  Q. Okay.
2  A. He was doing some ordering.
3  Q. Did you routinely share the IMAs, did
4  departments share an IMA?
5  A. Original when I first came to the
6  company, I believe we had five. When this was
7  about, I think we were down to about two, two to
8  three.
9  Q. So would you share them?
10 A. Kind of, yes and no. You had some
11 IMAs that were assigned to certain departments,
12 and we ended up getting -- if I recall, what I
13 can recollect, the guy that was doing mine,
14 there was another one Paul that wasn't doing his
15 job. We ended up having Elijah starting on this
16 was his name, and he didn't know much about the
17 department, but he was trying to order what he
18 could just going in and out of there.
19 Q. Did Elijah report to you?
20 A. Never, no.
21 Q. Was inventory your responsibility?
22 A. Mine, the assistant manager's, and the
23 store manager's.
24 Q. On a daily basis is it your

JONES REPORTING COMPANY
617-451-8900

Ernest Howland

141

1  responsibility to make sure that your department
2  was in stock?
3      A.   Mine, the assistant manager, and the
4  store manager.
5      Q.   So it's your testimony that it was the
6  store manager's responsibility to check
7  everybody's department on a daily basis to make
8  sure they were in stock?
9      A.   It went in a line. It's chain of
10 command.
11     Q.   Did the store manager, did Bill Shea
12 ever come to your department to make sure you
13 were in stock and then order stock if you
14 weren't in stock?
15     A.   He's picked up an IMA cart, yes. And
16 it's not just for my department. Everybody's
17 department.
18          MS. MOORE:  If it's okay, would we
19 be able to take a quick break?
20          MR. JOHNSTON:  Sure.
21          (Recess taken from 12:40 p.m.
22 to 12:56 p.m.)
23          MS. MOORE:  Can you read back where
24 we left off?