Ernest Howland

142

1              (Record read)

2    BY MS. MOORE:

3        Q.   Mr. Howland, under the key development

4    needs, did you agree that you needed to do more

5    aisle walks?

6        A.   Did I need to do more aisle walks?

7    No.

8        Q.   You thought you were sufficient in

9    that category?

10       A.   Yes.  I thought that that was actually

11   just being put in there because you got to come

12   up with five different reasons for key

13   developments.

14       Q.   Did you feel you needed to work on

15   being in stock?

16       A.   Every store did, yes.

17       Q.   Did you feel that you did?

18       A.   Yes.

19       Q.   Did you feel that you needed to work

20   on the key standards?

21       A.   No.

22       Q.   Why did you disagree with that?

23       A.   Because we were at the key standards.

24       Q.   Meaning?

Ernest Howland

143

1       A.   Everything according to the key

2   standards, the actual policy on it, it was

3   happening.

4       Q.   In your department?

5       A.   Yes, it was.

6       Q.   On February 10, 2004?

7       A.   Yes.  I got to reiterate that.  Being

8   back after -- only being back for a week, during

9   the time I was gone a lot of orders hadn't been

10  called, you know.  We had a lot of old dead

11  orders in there that we had to go through.

12          So I can't say -- yes, we needed to

13  work back on the standards to go through it

14  because while I was out, no one was following up

15  on it.

16      Q.   Okay.  So then it was a pretty fair

17  statement to make given where the department was

18  when you returned?

19      A.   Absolutely.

20      Q.   Was it fair to say that you needed to

21  help get everybody involved?

22      A.   Everybody was involved in the

23  department.

24      Q.   So you felt that was an unfair

Ernest Howland

144

1    statement?

2        A.    Yes.

3        Q.    And did you feel you needed to work on

4    grand opening ready?

5        A.    After being gone for seven or eight

6    weeks, yes.

7        Q.    Did you feel that you needed to work

8    on it at all, even if you hadn't been gone, did

9    you feel that that that was something your

10   department needed to work on?

11       A.    You're asking me at this time.  When I

12   walked in -- my GOR process stopped the moment I

13   left.  It was never worked with the whole time I

14   was gone.

15       Q.    But you weren't at grand opening ready

16   when you left.

17       A.    But the process was -- we were doing

18   it on a weekly basis, doing a bay week and

19   everything else.  My assistant manager should

20   have followed up in my absence to make sure this

21   was happening.  Nothing happened in GOR while I

22   was gone.

23       Q.    Okay.  Nevertheless, when you left in

24   November of 2003, you weren't at grand opening

Ernest Howland

145

1    ready, correct?

2        A.    No, nobody was, correct.

3        Q.    And your department wasn't either,

4    right?

5        A.    Right.

6        Q.    Let's go back to the development plans

7    and training thoughts.

8             You mentioned that you were already

9    doing the aisle walks, correct?

10       A.    Yes.

11       Q.    Did you continue to do them?

12       A.    Absolutely.

13       Q.    We were talking about the in stock

14   level, pushing for 100 percent.  What did you do

15   to make sure you would get to 100 percent for in

16   stock level?

17       A.    I was walking the aisles, checking for

18   my out of stocks and ordering it.  It's called

19   an open tub.  I was working the open tubs.

20   That's where our open vials are, our open

21   purchase orders, to see if it was ordered; if

22   not, getting it ordered.

23       Q.    Okay.  "Make sure all quotes are

24   followed up and key standards are up to speed."

Ernest Howland

148

1   walked you?

2        A.   Well, I do want to bring this up.  I

3   don't know if I had another review after this, I

4   can't recall, I can't remember.  There was one

5   that we sat down, Ed Boylan was there and Ken

6   Bleakney was, and it was decided upon on it that

7   we were going to walk on a weekly basis.

8        Q.   And did you walk on a weekly basis?

9        A.   One time it happened before I was

10  terminated.

11       Q.   Did you talk to Mr. Boylan about it?

12       A.   Absolutely, and I also approached

13  Mr. Bleakney.

14       Q.   And what was Mr. Boylan's response?

15       A.   We'll get to it.  But he says, How do

16  you feel?  And I would tell him how I felt.  And

17  that was the exact same thing that Ken Bleakney

18  would say, How do you feel about it?  And I told

19  him I feel really confident about it because we

20  were supposed to do a weekly review, you know,

21  we were going to do the walk and have a weekly

22  update concerning this, and I constantly went to

23  them.

24       Q.   And it's your testimony that they

Ernest Howland

151

1    has been marked as Exhibit 8.  It's entitled

2    Performance Discussion Tracking Form, and it is

3    Bates stamp numbered DEF0024 in the

4    lower-right-hand corner.

5              When you've had a chance to review the

6    document, would you let me know?

7         A.    Yeah.

8         Q.    Do you recall having a conversation

9    with Mr. Boylan or Mr. Bleakney about your

10   performance on or about March 1st of 2004?

11        A.    No.  Once again, I don't know what

12   this form is.  We did -- like I said, I thought

13   it was during a review, but maybe I'm wrong, but

14   we talked about the performance, how we were

15   going to be walking on my progress on a weekly

16   basis.

17             But March, no, I don't think so,

18   because this went on before I got terminated,

19   probably about over six weeks, I'd say, that I

20   kept asking for this weekly walk.  And I also

21   wanted my review because I was told I was going

22   to get another one.  So I would say I don't

23   think that date's right.

24        Q.    Okay.  Do you recall having a

Ernest Howland

152

1   conversation at all with Mr. Boylan and

2   Mr. Bleakney some time on or around the

3   beginning of March 2004?

4       A.   Like I told you, I don't know about

5   the date.

6       Q.   Okay.  But you did have a conversation

7   with them about your performance?

8       A.   Yes, which we were going in the right

9   direction, yes.

10      Q.   Do you recall being told that you were

11  going in the right direction?

12      A.   Absolutely.

13      Q.   Do you recall being told that you

14  still had a distance to go?

15      A.   No.

16      Q.   So it's your testimony that when you

17  had this meeting with Mr. Bleakney and

18  Mr. Boylan, that they simply told you you were

19  doing better?

20      A.   I was doing better, and we were going

21  to follow up on this, and they were going to

22  walk my department on a weekly basis.

23          What it was was my assistant manager

24  was going to walk me.  We were going to meet in

Ernest Howland

153

1    the HR office with Ken Bleakney every week.

2             MS. MOORE:  Could you read back my

3    question and his answer?

4             (Record read)

5    BY MS. MOORE:

6       Q.   So when you had that conversation, you

7    understood that you still weren't up to par,

8    correct?

9       A.   No, I wouldn't say I wasn't up to par.

10   We wanted to move forward.

11      Q.   If your performance had been where it

12   needed to be, would they have needed to take you

13   on weekly walks?

14             MR. JOHNSTON:  Objection.

15      A.   Yes.

16             MR. JOHNSTON:  I guess it's a

17   difference of opinion.  I guess his opinion is

18   it didn't.  If you're asking him what their

19   position was in these letters, they speak for

20   themselves.

21      Q.   I'm asking you if your understanding

22   is that if your performance had been up to par,

23   would you still need to be walked by your ASM on

24   a weekly basis?

Ernest Howland

155

1   during my staff meetings he'd mention that, that

2   the ASMs need to get in there and walk with

3   their department heads on a daily basis.

4        Q.   So your testimony is that Bill Shea at

5   department meetings would say out loud that the

6   ASM needed to walk department managers every

7   day?

8        A.   Absolutely.

9        Q.   Do you recall Mr. Boylan or

10  Mr. Bleakney at some point having a conversation

11  with you in late February after you were given

12  your review dated February 10, 2004 about your

13  need to make smart work lists for the people in

14  your department?

15       A.   No.  Once again, it was a work list.

16  I've never heard of this word smart work list.

17  I left smart work lists.  So I say no.

18       Q.   So they never had a conversation with

19  you about it?

20       A.   No.

21       Q.   Do you ever recall Mr. Boylan or

22  Mr. Bleakney after giving you the March 10th --

23  I'm sorry, the February 10, 2004 review talking

24  to you about the fact that you need to stop

Ernest Howland

156

1  doing so much work yourself and delegate it to

2  your associates?

3      A.    It was said to me constantly.

4      Q.    By whom?

5      A.    Well, they mentioned it, and the store

6  manager. But the thing is, once again, my

7  people that I had, the little amount, they were

8  constantly at the desk dealing with the

9  customers with customer service. That's what we

10 were built on. And if I had two people that

11 were trained for the desk, I would be in the

12 aisles.

13          I didn't have many backup people. I

14 wasn't going to walk away from my department.

15 It would have been disastrous. So I had to do a

16 lot of the work.

17     Q.    Was your department disastrous?

18     A.    No, I'm saying on a daily basis when

19 customers shopped it, you know, you can have

20 someone grabbing a ceiling tile and drop it on

21 the floor and have a mess. That's what I'm

22 talking about.

23     Q.    So you do remember having

24 conversations with Ed Boylan and Ken Bleakney

Ernest Howland

157

1    with regard to some of the points in Exhibit 8,

2    just not all of them?

3          A.    It was mentioned to me about, you

4    know, me doing -- working and delegating it, but

5    I had no one to delegate.  They were making an

6    accusation that couldn't happen.

7          Q.    Does that mean yes, you do?

8          A.    Yes.

9          Q.    I'm not putting words in your mouth.

10   I just need you to answer my question, and my

11   question is do you remember having conversations

12   after the February 10, 2004 review with Ed

13   Boylan and Ken Bleakney where some of these

14   issues laid out in Exhibit 8 were addressed?

15         A.    Yes.

16         Q.    Do you remember being told by either

17   Mr. Boylan or Mr. Bleakney after the

18   February 10, 2004 review that you were scheduled

19   for DST training at the end of March?

20         A.    It was for April.

21         Q.    You remember them telling you that it

22   was to be scheduled in April?

23         A.    Yeah.  I signed up for that myself in

24   April.  They never told me I was assigned to be

Ernest Howland

158

1    on DST.  I went and signed up myself in April.

2        Q.    How did you sign yourself up?

3        A.    I went to Ken Bleakney to get me on

4    the list to get my DST training.

5        Q.    And your testimony is that you went to

6    him in April?

7        A.    Yes, I'd say April.  I do want --

8    you're asking me a question.  It was not at this

9    time, that's for sure.

10       Q.    That you approached Mr. Bleakney?

11       A.    Absolutely it wasn't.

12       Q.    So your testimony is that it was some

13   time --

14       A.    It happened after that.

15       Q.    You were not -- let me ask you a

16   question.

17            Your testimony is that on March 1,

18   2004 or around that time Mr. Bleakney nor

19   Mr. Boylan came up to you to tell you that you

20   were scheduled for DST training at the end of

21   the month?

22       A.    No.

23       Q.    And it's your testimony then that some

24   time in April you approached Mr. Bleakney about

Ernest Howland

160

1  been marked as Exhibit 9.  It's entitled

2  Performance Discussion Tracking Form.  It's

3  Bates stamp number DEF0023 at the

4  bottom-right-hand corner, and it includes a date

5  of March 22, 2004.

6          Do you recall having a conversation

7  with Mr. Shea or Mr. Boylan about being taken on

8  a walk on or about March 22, 2004?

9      A.  Can you repeat it because I can't even

10  read what this says?

11          MR. JOHNSTON:  For the record, it's

12  back to Holland.

13      A.  Can I take a break really quick?  I

14  have to ask him something.

15      Q.  Sure.

16          (Witness and counsel confer

17          from 1:17 p.m. to 1:19 p.m.)

18  BY MS. MOORE:

19      Q.  Do you recall being walked by

20  Mr. Boylan and Mr. Shea toward the end of March

21  2004?

22      A.  No, I don't.

23      Q.  Do you recall being walked at all in

24  2004 by Bill Shea and Ed Boylan?

Ernest Howland

161

1      A.   In the year 2004?  I can't answer it.

2  I don't have a yes-or-no answer.  Do I recall

3  it?  No.

4      Q.   Do you recall ever being walked by Ed

5  Boylan, Bill Shea, and Ken Bleakney toward the

6  tail end of your employment at Home Depot?

7      A.   No.

8      Q.   So then is it fair to say that you

9  don't recall any of the incidents recounted on

10  Exhibit 9?

11      A.   I don't even know what this is, once

12  again.

13      Q.   I understand that, and Mr. Howland,

14  I'm not asking you if you've seen this page

15  before because from my understanding this is

16  something that management documents, and it's

17  not given to associates.  I'm simply asking if

18  from what's listed on the page --

19      A.   Well, I'm saying I can't even read

20  what's on my page.

21      Q.   I'll read it to you then.

22      A.   Thank you.

23      Q.   Date, 3/22/04.  "The above-named

24  associates conducted a walk with Ernie Howland.

Ernest Howland

162

1    Specific example" --

2              MR. JOHNSTON:  Holland.

3              MS. MOORE:  Thank you.

4    BY MS. MOORE:

5        Q.    "Specific example related to GOR

6    process and in stock condition and shelf

7    maintenance, failures were noted.  A store walk

8    was scheduled for Friday, 3/26.  On 3/26 it's

9    noted improvement was noted on GOR in stock

10   condition and shelf maintenance.  Ernie was

11   informed by Bill Shea and Ed Boylan that his

12   department looked better than on 3/22 but

13   improvement was still needed."

14             Do you recall the incident as

15   recounted on 3/22?

16       A.    No.

17       Q.    Do you recall the incident as

18   recounted on 3/26?

19       A.    I remember something on that now that

20   I've seen that.

21       Q.    What do you recall?

22       A.    I remember a walk telling me it was

23   looking better.

24       Q.    Do you recall Mr. Boylan and

163

1    Mr. Bleakney and Bill Shea being present?

2         A.    I cannot recall who was there.

3         Q.    When you were told that you were

4    improving, do you recall being told that you

5    still had a ways to go?

6         A.    No.

7         Q.    Mr. Howland, did you ever see forms

8    where you were listed as Ernie Holland instead

9    of Ernie Howland?

10         A.    No.

11         Q.    If you had seen a form that said Ernie

12    Holland on it and it was handed to you, would

13    you just presume someone misspelled your last

14    name?

15         A.    Probably.

16              MS. MOORE:  Could you mark this,

17    please.

18              (Exhibit 10 marked

19              for identification)

20         A.    But you're bringing this up, I think

21    this is every one of them, you know, or having

22    the wrong name.  I wouldn't presume this.

23              I'd like to bring it to your

24    attention, somebody in the store had gotten a

Ernest Howland

164

1   hold of me after I was terminated, and I was

2   told that Ed Boylan was writing out all kinds of

3   reviews and stuff on the sales floor, and this

4   person found it and handed it over to the store

5   manager.

6        Q.   Who was that?

7        A.   Annette Fortier.

8        Q.   Is she a Home Depot associate?

9        A.   Absolutely.

10       Q.   And your testimony is that some time

11   after you were terminated, Annette Fortier

12   called you at home?

13       A.   I talked to Annette, yes.

14       Q.   Did she call you at home?

15       A.   I can't recall if I called her at home

16   or she called me at home.

17       Q.   Did you initiate the call or --

18       A.   I don't recall, but it was her that

19   told me this, that Ed Boylan was working --

20   using an IMA cart and writing out a bunch of

21   paperwork with my name on it.  And this was a

22   week or two after I was gone.

23       Q.   And when did she tell you this?

24       A.   I believe that happened like on a

Ernest Howland

165

1    Saturday or a Sunday, and she told me probably

2    about two days later.

3        Q.    Wouldn't that have been the time your

4    son was born?

5        A.    I said about two weeks after the fact.

6    Maybe that is even when because she actually

7    came to the hospital to see my son being born.

8    She was calling me to see how everything was

9    going a week or two after my son was born too.

10        Q.    What department did Annette Fortier

11    work in?

12        A.    She worked for me in Department 23,

13    floor and wall.

14        Q.    Did she say to you where she saw

15    Mr. Boylan filling out --

16        A.    Right in front of the cart at the time

17    desk, they have these pods, carpeting pods.

18        Q.    Did anyone else see it?

19        A.    I don't know.  I didn't want to get

20    into it.  But she did tell me she actually

21    turned this over to Bill Shea.  Bill Shea

22    actually called him up.

23        Q.    How do you know that?

24        A.    This is what she discussed with me and

Ernest Howland

170

1    time?

2        A.    No.  I actually took his department

3    after he was gone.

4        Q.    Is that the source of some contention

5    between the two of you?

6        A.    No.  Basically after he came back, me

7    and him weren't hitting it off, at least that's

8    the impression I was getting from him.

9            Before he left, he had ended up

10   closing the store one night and literally

11   locking the doors and telling the employees, no

12   one was leaving until everything was done.

13           I personally went up to him and told

14   him that was against the law.

15       Q.    When was this?

16       A.    This was while he was a department

17   head.

18       Q.    In 2003?

19       A.    No, it was probably about 2002.

20           But I had problems with him because I

21   ended up going to store manager and making a

22   complaint concerning it because what he did was

23   wrong.

24           And then he left, and then he came

Ernest Howland

171

1    back, and that's all in my head I really feel it
2    was like a get-back.
3        Q.    So you're saying that at some point
4    you told the store manager, meaning Bill Shea,
5    that he had locked the doors and told people
6    they couldn't leave?
7        A.    Exactly.
8        Q.    What was Mr. Shea's response?
9        A.    That he shouldn't be doing that.
10       Q.    Do you know if anybody else
11   complained?
12       A.    I don't know.
13       Q.    Was anybody else standing around when
14   you spoke to Mr. Shea about Ed Boylan?
15       A.    I don't recall.  That was way back.
16   You're talking -- I became a department head in
17   what, 2002, or something like that.
18       Q.    Did you feel that Mr. Boylan was
19   responsible for your termination?
20       A.    Absolutely.
21       Q.    Why?
22       A.    It just shows it with the reviews
23   alone, that I went from, you know, this
24   (Indicating) to here (Indicating) as soon as he