Ernest Howland

172

1    started doing my reviews.

2            MS. MOORE:  The record will reflect

3    that Mr. Howland is going from high to low.

4        A.   Even when I tried talking to him, I

5    didn't think I was getting the responses I

6    needed from him or the help I needed.

7            You can read all this, but it wasn't

8    there with him.  He didn't come and help.  You'd

9    page the man to the department to help you out

10   for even questions.  He wouldn't even answer.

11           There was a time that the assistant

12   Mark, that's in there right now, could actually

13   say I ended up calling him for some help, and he

14   told me to meet him up in the front of the

15   store.  I walked up to the front of the store

16   with a customer at the desk and told her I'd be

17   right back, walked up there, and Ed Boylan

18   wasn't there.  I turned to Mark and asked him

19   where he went, and he said he booked it out the

20   other door because he didn't want to talk to me.

21           These were some of the issues that

22   were happening.

23       Q.   Who told you that?

24       A.   Mark.

Ernest Howland

173

1     Q.  Mark who?

2     A.  The assistant manager.  I forget his

3 last name.  He is still there as an ASM.

4        They all thought it was a joke, you

5 know.

6     Q.  So you thought Mr. Boylan terminated

7 you because he -- because he had a beef with

8 you?

9     A.  I don't know what it was.  I just

10 didn't feel I got a fair shake with him.  I

11 really don't.

12     Q.  And you feel that that's why you were

13 terminated?

14     A.  I think a lot had to do with it, I

15 really do.

16           MR. JOHNSTON:  Can I take a break?

17           MS. MOORE:  Sure.

18           (Witness and counsel confer

19           from 1:31 p.m. to 1:34 p.m.)

20           MR. JOHNSTON:  The witness would

21 like to clarify something, if you'll permit him

22 to do so.

23           MS. MOORE:  Sure.

24     Q.  Your attorney has indicated that you'd

Ernest Howland

174

1  like to clarify your testimony.

2      A.   Yeah.  On last one with the Ed Boylan,

3  I was more talking on the reviews itself, that

4  he had a lot to do with my bad reviews, not on

5  the termination but on the reviews.  The

6  termination was caused by the FMLA.

7      Q.   Okay.  Mr. Howland, I'm going to give

8  you Exhibit 10.

9           MS. MOORE:  I'm going to go off the

10 record for a second.

11           (Discussion off the record

12           from 1:35 p.m. to 1:35 p.m.)

13 BY MS. MOORE:

14     Q.   Mr. Howland, you've been handed

15 Exhibit 10, which is Bates stamp number DEF0022,

16 and it's entitled Performance Discussion

17 Tracking Form.  The date on the form is April 1,

18 2004.

19           Do you recall having a conversation

20 with Mr. Boylan in April 2004?

21     A.   No, I do not.

22     Q.   Do you recall having a conversation

23 with Mr. Boylan in April 2004 where he mentioned

24 to you that you needed to pick up the pace with

Ernest Howland

175

1    regard to your performance in the department?

2        A.    This never was ever even discussed.  I

3    would have remembered something like this, even

4    with the smoking.

5        Q.    So your testimony today is that you

6    never had a conversation with Mr. Boylan

7    about --

8        A.    Never.

9        Q.    -- your need to be in the aisle,

10   running the department, out with your people?

11       A.    Never.  This discussion never

12   happened.

13              MS. MOORE:  Would you mark this,

14   please.

15              (Exhibit 11 marked

16              for identification)

17   BY MS. MOORE:

18       Q.    Mr. Howland, you've just been handed

19   what has been marked as Exhibit 11.  It's

20   entitled Discipline Notice, and it's Bates stamp

21   number DEF0020 in the bottom-right-hand corner.

22              After you've had a chance to read the

23   document, would you let me know?

24              (Pause)

Ernest Howland

177

1    meet him in the computer room.

2        Q.    Was anybody else there?

3        A.    Peter Hammond.

4        Q.    Mr. Hammond overheard Mr. Boylan tell

5    you to meet him in the computer room or

6    Mr. Boylan was --

7        A.    No, no one else was present there.

8    Peter Hammond was in the office.

9        Q.    Was any other manager or department

10   supervisor present for the review that

11   Mr. Boylan provided you?

12       A.    No.

13       Q.    Okay.  What did Mr. Boylan say to you

14   when you got to the computer room?

15       A.    He told me to take a seat and told me

16   You wanted your review?

17            And I says, Yeah.

18            And he says, Well, he says, your

19   review is not good.  It has its ups and its

20   downs.  We're going to have to let you go.

21            That was my review.

22       Q.    And that was the entirety of the

23   conversation?

24       A.    Yeah.  They gave me a piece of paper

Ernest Howland

178

1  to sign for my wages, and I -- first of all, I

2  thought he was joking.  I looked at Peter

3  Hammond and realized it wasn't no joke.  I

4  thought he was just joking around with me.

5      Q.  Who is Peter Hammond?

6      A.  He's another assistant manager.

7      Q.  And it's your testimony that

8  Mr. Hammond was partaking in the review?

9      A.  I had no idea why he was there.  I

10  thought maybe they wanted two people present.

11      Q.  And what did you say in response to

12  Mr. Boylan's statement?

13      A.  which statement exactly?

14      Q.  That your review had ups and downs and

15  that they were going to have to let you go?

16      A.  I didn't know what to say.  I was

17  really astounded, especially when I was supposed

18  to be meeting with Ken concerning my FMLA.  I

19  had no idea what came up with this.  Plus I was

20  expecting to actually see a review.

21      Q.  Was anybody other than Mr. Boylan and

22  Mr. Hammond present?

23      A.  Nobody else was present.

24      Q.  Ken Bleakney wasn't there?

Ernest Howland

179

1    A.    No, he was not.

2    Q.    Did you speak to Mr. Bleakney on

3    April 15, 2004?

4    A.    Earlier in the day.

5    Q.    What did you speak to him about?

6    A.    About my FMLA.

7    Q.    What did he say to Mr. Bleakney?

8    A.    That I wanted paperwork for the FMLA

9    so I could get it in because I only had a week

10   left.

11   Q.    When was the first time you requested

12   FMLA leave?

13   A.    The 7th of April.

14   Q.    And when was your wife due?

15   A.    The 23rd.

16   Q.    Did she have a natural birth?

17   A.    She had a cesarean.

18   Q.    Did you schedule the cesarean?

19   A.    Yep.

20   Q.    When did you schedule it?

21   A.    Offhand, I can't remember exactly.

22   Q.    Did you schedule it in February?

23   A.    Probably even before that.

24   Q.    Maybe January?

Ernest Howland

180

1       A.    Maybe.

2       Q.    But before February 2004?

3       A.    Yes.

4       Q.    So knew in February of 2004 when your

5   wife was going to deliver your baby?

6       A.    Yes.

7       Q.    When did you first request vacation

8   leave?

9       A.    Back in February, the day that we

10  found out what day my wife was having the baby,

11  after it was scheduled, the very day.  I believe

12  I was working that night, and I brought in the

13  information, and that's when I requested it.

14      Q.    So your testimony is that -- is your

15  testimony that in February you requested your

16  vacation time, or is your testimony that

17  whatever day it was that you scheduled the

18  cesarean section, you requested your vacation

19  time?

20      A.    Rephrase that?  I lost you all of a

21  sudden.

22      Q.    I'm trying to figure out when it was

23  that you said you first requested your vacation

24  time.  Was it in February of 2004, or was it

Ernest Howland

181

1  whenever the date was that you scheduled your
2  wife's cesarean?
3      A.   The day we found out that -- when it
4  was scheduled is when I requested it.  You're
5  saying in February.  I can't remember exactly
6  when we found out what day she was having --
7  when it was scheduled.  But we got the date,
8  which is April 23rd, and that's when I was
9  requesting my vacation.
10     Q.   Did you request April 23rd as the
11 date?
12     A.   Absolutely, starting with April 23rd.
13     Q.   Did you request April 23rd for the
14 date of her cesarean?
15     A.   Yes.
16     Q.   So you chose April 23rd to be the date
17 your son was delivered?
18     A.   My wife did, yes.
19     Q.   And how were you informed that
20 April 23rd would, in fact, be the day?
21     A.   Her doctor told her.
22     Q.   At a routine appointment?
23     A.   I imagine so.
24     Q.   I want to leave FMLA and vacation time

Ernest Howland

189

1    schedule.  Did I do a no call, no show?

2    Absolutely not, ma'am.

3          Can I also say something concerning

4    that?  There also was times they changed the

5    schedule in pen or pencil on the schedule where

6    we actually saw our schedule where they didn't

7    change it in the computer.  Then that's computer

8    generated.  I know that's what that is.

9        Q.   Was there ever a time when you were at

10   work where you didn't punch in or punch out?

11       A.   No.

12       Q.   Mr. Howland, we are going to go back

13   to the issue of your vacation requests and your

14   leave request or your alleged leave request.

15         It's my understanding that you applied

16   for a vacation leave in or about February 2004;

17   is that correct?

18       A.   When my wife found out.  You're asking

19   me for February.  I don't know.  I'm sure my

20   wife might be able to tell me on that.

21       Q.   How about this one, you applied for

22   vacation leave within several days' notice that

23   your wife had been scheduled for cesarean

24   section on April 23, 2004?

Ernest Howland

190

1      A.   Yes.

2      Q.   How did you apply for your vacation

3  leave?

4      A.   Filling out the vacation forms.

5      Q.   Where did you get a vacation form?

6      A.   They're left right out in front of the

7  computer room.

8      Q.   And can anybody pick up a form?

9      A.   Yes.

10     Q.   So what is the procedure then?

11     A.   You fill it out, and then you give it

12 to the store manager for him to approve it.

13     Q.   Does the store manager have to approve

14 everybody's?

15     A.   Yes.

16     Q.   Is there a different procedure for

17 department heads as opposed to associates?

18     A.   No.

19     Q.   So everybody picks up a vacation form,

20 a vacation request form?

21     A.   Yes.

22     Q.   They state -- what do they put on the

23 form?

24     A.   The times that you're requesting for

Ernest Howland

191

1    your vacation.

2        Q.    Do you put why?

3        A.    You don't have to, I don't believe,

4    but I believe I did list why because I had also

5    spoken to my store manager prior to that.  He

6    knew, so I probably did write for the birth of

7    my child.

8        Q.    How many days vacation were you

9    requesting?

10       A.    If I'm right, it was roughly seven

11   days starting on the 23rd.

12       Q.    So does that mean that you would

13   basically be out of work a week?  Does that mean

14   for seven days, whatever days you would have

15   been scheduled, you wouldn't be scheduled those

16   seven days?

17       A.    It would be the at least a week out

18   because my wife was going to be in for a

19   cesarean.  Roughly five days minimum.

20       Q.    What I'm asking you is when you say

21   you were requesting seven days, does that mean

22   you just wanted a week off, or does that mean

23   you wanted whatever the equivalent of seven days

24   of work time?

Ernest Howland

192

1    A.    No, seven days.

2    Q.    Meaning a week?

3    A.    Yeah.

4    Q.    After you filled out the form, what

5    did you do with it?

6    A.    Put it in the computer room for Bill

7    Shea to sign.

8    Q.    You didn't hand it to him?

9    A.    No.

10   Q.    You left it in the computer room?

11   A.    I left it -- I know it went in the

12   computer room, but I can't remember if -- I

13   don't recall if I went to him and asked him to

14   sign it there.  I don't recall on that one.

15   Q.    A moment ago you said the procedure

16   for requesting vacation time was that you would

17   give it to the store manager?

18   A.    But the thing is he also -- you give

19   it to the computer person, which the store

20   manager is the one that approves it.  You don't

21   have to go up to him to hand it to him to sign.

22   The store manager is the one that approves

23   those.  He signs the papers for the approval,

24   that's what I'm saying.

Ernest Howland

199

1    times, and he did the first one.  He knew I was

2    going on vacation for my child's birth.

3         Q.   Because you had had a conversation

4    with him?

5         A.   Absolutely, and also because of the

6    first child, he knew of all the problems we had

7    with the first birth.  He knew we had a lot of

8    problems with the first birth.

9         Q.   When was your first child born?

10        A.   In May of 2002.

11        Q.   Did you request vacation time then?

12        A.   Yes, I did.

13        Q.   Did you receive it?

14        A.   Yes, I did.

15        Q.   Did you have any problem getting it?

16        A.   Then, no.

17        Q.   Who was your supervisor then?

18        A.   That would have been -- I don't know

19    if it was Flavio or Norman.

20        Q.   And was Bill Shea the store manager

21    then?

22        A.   Bill Shea was the store manager.

23        Q.   You walk up to him and you hand him

24    the request?

Ernest Howland

200

1    A.   Yes, only because --

2              MR. JOHNSTON:  This is the second

3    time?

4              MS. MOORE:  Yes.

5    A.   The reason why I walked up to him was

6    I was off the clock, I was heading out.  I went

7    to give it to him and Kim Arcikowski was there.

8              He told me to just drop it off in the

9    computer room.  He'll sign it.  I'm, like, all

10   right.

11             So that's all I did.  I brought it

12   back to the computer room and put it in the

13   computer room.

14   Q.   Did you give it to anybody?

15   A.   I believe Sheila was in there at the

16   time.  Somebody was in there.  I handed it, I do

17   remember that.

18   Q.   And then what happened?

19   A.   About two days later, roughly, Sheila

20   came to me and told me that Bill has denied my

21   vacation.

22             And I brought up to her I was already

23   approved the first time.  He told me all I had

24   to do was fill out the paper again.

Ernest Howland

201

1    Q.    Okay.  What was her response?

2    A.    That he denied it.

3    Q.    Did you pull out your paper where you

4  could say, see, he signed it the fist time?

5    A.    I couldn't find it.  I might have

6  searched for it.  I couldn't find it.  He wanted

7  me to fill it out again.  I did what I was told.

8    Q.    Did you look for the first signed

9  version?

10    A.    I'm sure I did.

11    Q.    Do you remember if you found it?

12    A.    No, I didn't.  It could be -- it could

13  be even at my house, for all I know.

14    Q.    Did you ask the folks at Home Depot to

15  look to see if they had the original?

16    A.    I mentioned it to Sheila, but there

17  was nothing ever said that we didn't have it or

18  if they did.

19    Q.    Did you ask her to look for it?

20    A.    I just mentioned it to her.  I told

21  her I had gotten approval for the first time,

22  but Bill asked me to do it again, and that one

23  got denied.  And that's basically where it had

24  to go.  I was being denied now.

Ernest Howland

203

1   didn't bring it back to you, you let it go?

2       A.    Right.

3       Q.    The second request is denied.  What

4   happens next?

5       A.    I ended up going to our scheduler, who

6   was Sylvia Ramsdale.

7             The reason why I went to her, he could

8   have said one thing to Sheila, but he could have

9   done something with Sylvia because I also

10  reminded Sylvia about it.

11            So I went to her and asked her if Bill

12  told her it was denied also.  She didn't know.

13  She said no.

14            She ended up coming back to me the

15  next day, two days later telling me that he said

16  I wasn't going to take it because when his wife

17  had a baby, he only took one day off.

18      Q.    So Sylvia told you that Bill Shea had

19  told her when she approached him about signing

20  the second leave request and that it had been

21  denied, that you couldn't have your vacation

22  time because when he had a baby, he took one

23  day?

24      A.    Absolutely, yes.

Ernest Howland

204

1    Q.    Did she say that anybody was around
2  when Bill Shea said that to her?

3    A.    I don't know.

4    Q.    Did you ask her?

5    A.    I don't recall.

6    Q.    Did you ask her if she said --

7    A.    I don't recall.

8    Q.    After she told you that, what did you
9  say?

10   A.    That I need to take the time off for
11 my kid's birth because it was imperative.  I had
12 to be home.

13   Q.    What did she say?

14   A.    She mentioned the FMLA to me,
15 explained it to me.

16   Q.    Had you ever heard of FMLA?

17   A.    I heard of it but didn't know much
18 about it.

19   Q.    When you went to put in your vacation
20 time for the seven days, did you go back to your
21 benefits book at all that you were given at
22 orientation?

23   A.    After I got denied, is that what you
24 said?

Ernest Howland

206

1    Q.    How do you know that she did it?

2    A.    She told me.

3    Q.    She told you she hung up --

4    A.    She mentioned to me that she put it

5    up.

6    Q.    I want to make sure I'm on the same

7    page.

8    A.    Okay.

9    Q.    Second request is denied.  You think,

10   okay, maybe Sheila's got it wrong.  I'm going to

11   chat with Sylvia.  You go to Sylvia, she says,

12   you know, I don't really know, goes to Bill

13   Shea, comes back to you a couple of days later

14   says, Bill Shea told me that you're not going to

15   take -- he's not going to give the seven days

16   because when he had a baby, he only took one

17   day?

18   A.    Right.

19   Q.    You say, I need the time.  She says,

20   again, what about the FMLA?

21   A.    Right.

22   Q.    You then go to look at some poster

23   that she told you --

24   A.    No, not right then and there.  What I

Ernest Howland

208

1    reason, I don't know.

2        Q.   Do you remember what day this was?

3        A.   I believe it was like the 9th, 10th,

4    somewhere around there.

5        Q.   So did you approach him again?  Strike

6    that.

7             What did you do after he told you he'd

8    discuss it at the staff meeting?  The staff

9    meeting comes, goes, there's no discussion, what

10   do you do next?

11       A.   I ended up finding out about the FMLA,

12   and Sylvia told me she'd talk to Ken Bleakney

13   because she was like also his assistant or

14   something at this time.  They were kind of

15   working on several things together.  So she was

16   like a to-go person also to get with him.

17            And she came back to me and told me

18   she had talked to Ken Bleakney and that I was

19   entitled to it.

20       Q.   Stop.

21            When Sylvia tells you what Bill Shea

22   said about you not getting the seven days

23   because he only got a day; you say, I got to

24   have the time; she says, okay, well, you can do