1  the FMLA. You then go to find Bill Shea and
2  have a one-on-one conversation about why you
3  were denied the second time?
4      A.  No. She didn't explain the whole FMLA
5  to me. She ended up talking to Ken Bleakney,
6  but the day I talked to her and she told me, no,
7  he mentioned about the -- about his wife, when
8  she had the baby, taking one day.
9      I wanted him -- I went to tell him my
10 wife wasn't having a natural. It was five days.
11 I also had a little baby at home too that I had
12 to take care of.
13     Q.  Okay. I just want to make sure I'm
14 following you timewise.
15     She tells you there is this thing
16 called the FMLA you. Guys don't necessarily
17 have an in-depth conversation, but she tells you
18 there's a poster?
19     A.  No, she told me afterwards that she
20 had ended up finding a poster or that Ken gave
21 her a poster to put in the break room.
22     Q.  After she tells you you're entitled to
23 this FMLA stuff, you say, okay, you go to Bill
24 Shea; is that correct? You don't have a long,

210

1  drawn-out conversation with you Sylvia, but go
2  to Bill Shea?
3       A.   Right.
4       Q.   The two of you have a conversation, he
5  says we'll talk about it at the staff meeting,
6  that doesn't happen.  A day later, two days
7  later you and Sylvia have a conversation about
8  FMLA?
9       A.   I believe it was like the 13th that --
10 it was after she talked to Ken.  So I ended up
11 seeing Ken the following day, which was the
12 14th, got with him.  I wanted to get the
13 paperwork and be able to take FMLA.
14      Q.   So at some time between the time you
15 had a conversation with Bill Shea and the time
16 you talked to Ken Bleakney about FMLA leave, you
17 and Sylvia had another conversation about how
18 she had communicated to Ken Bleakney that you
19 might be interested in taking FMLA leave?
20      A.   Right.  She had talked to him before I
21 even talked to Ken myself.
22      Q.   So this was some time between like the
23 9th or 10th and the 13th, 14th?
24      A.   Yes.

211

1   Q. Of April?

2   A. 13th.

3   Q. When Sylvia followed up with you to
4   tell you that she had spoken with Ken about your
5   desire to take FMLA leave, did she tell you to
6   go to the poster that was on the wall, is that
7   how the --

8   A. No, she just happened to mention that
9   he now gave her a poster to put up about the
10  FMLA.

11  Q. And you had never seen that poster
12  before that time?

13  A. No.

14  Q. Would you have paid attention to it if
15  you saw it?

16  A. Most likely I would have. Sometimes
17  when you're waiting to clock in, you read what's
18  on the wall.

19  Q. Sure.

20      So after you talk to Sylvia, you go to
21  talk to Ken, I think you said it was the 14th,
22  the 13th?

23  A. I talked to Ken the 13th, and then I
24  got with him again on the 14th.

1  Q. On the 13th you saw him in the store, you went to his office?

3  A. I believe to his office.

4  Q. You walk up to his office, and what happens?

6  A. I mention about the FMLA.

7  Q. You said?

8  A. And I told him that you talked to Sylvia, and she told me that you said that I am entitled to it, and he said yes.

11 Q. Okay. And then what happened?

12 A. The next day -- I don't know what happened the rest of that day, but the very next day I got with him again because I asked him about getting with some paperwork.

16 Q. Let me stop you.

17 A. Yeah.

18 Q. The first time you go to Ken and you say I know Sylvia talked to you about FMLA, she says you say I'm entitled to it, he says yes. You say what?

22 A. I'd like to take the FMLA.

23     I don't even know -- I'm sure by then he knew what was going on about the birth of my

1  child.

2  Q. And what was his response?

3  A. That I am entitled to it.

4  Q. And then did he say I'll see you in

5  three days?

6  A. I don't recall on that, but I do

7  remember the next day that I asked for it again,

8  and he told me he'd get it to me. He asked me

9  if I was scheduled the next day, he would get it

10 for me the very next day.

11 Q. And what was he getting for you?

12 A. The paperwork for my FMLA.

13 Q. Okay. So it sounds like to me then on

14 April 14th, Mr. Bleakney says to you, I'm going

15 to get you the forms for the your FMLA leave?

16 A. Yes.

17 Q. Okay. Did he give you the forms?

18 A. He was supposed to give it to me the

19 next day.

20 Q. Which was April 15th?

21 A. Yes.

22 Q. Did you see him to get them before you

23 were terminated?

24 A. I know he was in the building. I

214

1  never once saw him.
2      Q.   When you were going to talk to Ken
3  Bleakney about taking FMLA leave, how much time
4  were you interested in taking?
5      A.   I don't recall how much, but it
6  wouldn't have been that long, you know, a week
7  or two.
8      Q.   Why is it you think that -- strike
9  that.
10         Is there anything in the sort of line
11 of events that happened that I'm missing about
12 you requesting FMLA leave and/or your vacation
13 being denied?
14     A.   Rephrase it?
15     Q.   Sure.  Is there anything that you and
16 I haven't talked about today in the chain of
17 events surrounding your request for vacation
18 time or your request for FMLA leave because of
19 the birth of your son on April 23, 2004?
20     A.   I don't believe we're missing
21 anything.
22     Q.   Is there any reason why you might not
23 remember something today that occurred in that
24 time line?

1    A.   No reason.
2    Q.   My understanding is that you believe
3  that you were terminated because of your request
4  for FMLA leave?
5    A.   Absolutely.
6    Q.   Why is it that you believe that?
7    A.   Because I was more in my eyes, I
8  really feel this after working with Bill Shea,
9  now I'm overriding some of his decisions because
10 I'm going after what is offered to me, and here
11 I'm starting to talk about all this, and then
12 when I finally am going to get the paperwork,
13 I'm terminated.
14   Q.   Who did you talk to about it?
15   A.   About what?
16   Q.   You said you were starting to talk to
17 people about it?
18   A.   The FMLA, in that week's time, roughly
19 a week's time we're trying to -- after my
20 vacation was denied, I'm talking about FMLA.
21   Q.   To Ken Bleakney and to Sylvia
22 Ramsdale?
23   A.   And Bill Shea even knew.  I mentioned
24 that day when I even questioned that I'm going

Ernest Howland

216

1  to look into the FMLA.
2      Q.   Had you talked to your district
3  manager about the denial of vacation time?
4      A.   No.
5      Q.   But you still thought that you were
6  terminated because you went over Mr. Shea's head
7  by trying to get FMLA leave?
8      A.   Absolutely.
9      Q.   Is that the only reason?
10     A.   That's the way the man works.  Not
11 that I hate him or anything like that.  He's a
12 man that doesn't have a lot of words.  He
13 just -- this is it, end of story.
14     Q.   But the only reason you feel like you
15 were terminated was because you didn't accept
16 his final denial of your vacation?
17          MR. JOHNSTON:  Objection.
18     A.   Because I was requesting that FMLA.
19     Q.   Why, though?  Why do you think that
20 anybody cared whether or not you were requesting
21 FMLA enough to terminate you?
22     A.   That's the way the man works.  It's
23 like a payback.  But for me to answer why I
24 think, I don't know what was in his head.

1   Q.   Okay.
2   A.   You mention this, but I don't have an
3   answer to it because I can't tell you what he
4   was thinking.  I just know what happened, what
5   transpired.
6   Q.   But you didn't think the fact that you
7   had been on review and being reviewed every two
8   months since September played a role in your
9   termination?
10  A.   Absolutely not.  Like I said, last
11  time we met for my last review, and I do want to
12  emphasize this, we were supposed to meet every
13  week, and when I went to my assistant manager
14  and my HR questioning why aren't we meeting, I
15  want to know what my progress is, I was being
16  told, what do you think?
17       And I'm telling them what I think what
18  my department is.
19       Then you have nothing to worry about.
20  That was both of their exact words.
21       I went up to Ken Bleakney within days,
22  probably, or a week and mentioned this, you
23  know, what is going on?  You're telling me I'm
24  going to get my review again.  You people told

1  mean?
2      A.   Well, first of all, Mass. Health
3  didn't pay for all the medical throughout, and
4  they only went back so far.
5           Like I told you, this was a domino
6  effect in my eyes.  I got behind in my mortgage.
7  Like right now, even though I'm dealing with it
8  at this late stage, but my electric bill, that
9  goes all the way back until then.  Once you
10 start getting behind, I wasn't making the
11 income.
12     Q.   Okay.  So your testimony then is that
13 you suffered monetary damages from April 15,
14 2004 until you were hired by Ocean State?
15     A.   I'm making less even right now than I
16 was at Home Depot.  I'm a manager, but mine's a
17 salary at 55 hours.  So you asked me a question,
18 but I don't know what to answer.
19     Q.   How much are you making now at Ocean
20 State?
21     A.   711.
22     Q.   An hour?
23     A.   No, that's a weekly salary.
24     Q.   So you make $711 a week?

228

1   A. (Witness nods).
2   Q. I didn't know if you meant $7.11.
3   A. If you figure that out at 55 hours, I
4   do 55 hours a week.
5   Q. When you were terminated at Home
6   Depot, do you remember what you were making?
7   A. No, I don't recall exactly. If I'm
8   right, it was in the $14 range, somewhere around
9   there.
10  Q. Were you working the same number of
11  hours per week?
12  A. No. I was able to get time and a
13  half. I got extra hours when the need happened.
14  Q. Are you permitted to get extra hours?
15  A. Yes.
16  Q. Now?
17  A. I'm salary. They make me work more
18  hours and don't get paid.
19  Q. Your lawyer will know all about that.
20     So you are salaried now?
21  A. Yes.
22  Q. What is your salary?
23  A. I just told you, 711.
24  Q. So your salaried per week, not per

1  year?

2      A.   My yearly is 37,5.

3      Q.   Sorry, I'm not good at math.

4           MS. MOORE:  Just give me one

5  second.  I think I'm finished, but I need to

6  make sure.

7           THE WITNESS:  Can I take a break?

8           MS. MOORE:  Sure.  We're off.

9           (Recess taken from 2:32 p.m.

10          to 2:35 p.m.)

11 BY MS. MOORE:

12     Q.   I just want to follow up on two

13 issues, and then I'll be finished.

14          Earlier you mentioned that you

15 received offers from both Lowe's and Ocean State

16 about the same time.  Do you remember what the

17 salary was at Lowe's?

18     A.   It was open end for me to take the

19 job.  They wanted me to come in at one position

20 at a price, and they told me I could get into a

21 higher income, you know -- they wanted me to

22 come in as a department head right afterwards

23 because they had some moves that were happening.

24     Q.   And this is Lowe's?

231

1  I'm going to be able to make this amount.
2      Q.   I just want a specific answer to my
3  very specific question.  I understand that when
4  you were evaluating which job to take there were
5  myriad reasons why you might choose one over the
6  other.  I'm just trying to figure out which one
7  paid you more, straight dollars, who paid you
8  more money?
9      A.   I don't think it really was a big
10 difference.  I don't remember.  If anything, it
11 might have been right on about the same amount
12 of money.
13     Q.   The only other area I want to come
14 back to to make sure I'm clear about is your
15 testimony about Ed Boylan.
16          Is it your testimony that you felt
17 like his reviews were unfair in their entirety?
18     A.   On the ones that Ed Boylan did, yes.
19     Q.   Did you feel like Ed was the reason
20 you were terminated?
21     A.   No.
22     Q.   But Ed was the person who terminated
23 you, correct?
24     A.   He terminated me that day, yes.

232

1   Q.   Did you feel like his feelings about
2   you as you feel were evidenced in the review was
3   part of the decision to terminate you?
4   A.   That day I would say no. I saw
5   something -- I'm going to be honest with you, I
6   saw something in Ed Boylan that I hadn't seen.
7   That guy was watery in his eyes when he was
8   doing this, so I don't think he felt happy doing
9   it. But -- and the thing is I know he didn't
10  want to be in that position. So the store
11  manager should have been there is what I'm
12  saying.
13  Q.   You mean --
14  A.   He was forced to do it.
15  Q.   You mean he didn't want to terminate
16  you?
17  A.   I can't answer for that. The store
18  manager should have been there.
19  Q.   In your opinion?
20  A.   There ain't no doubt in my mind.
21  Q.   Had you had a conversation with Ed
22  Boylan about any of this, anything since your
23  termination?
24  A.   I haven't talked to anybody except for